**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STEVEN J. SKLAR (as IRA Account
Beneficiary), on behalf of himself and all
others similarly situated,

        Plaintiff,

    v.

BANK OF AMERICA CORP., KENNETH
D. LEWIS, JOHN A. THAIN, GARY A.
CARLIN and NELSON CHAI.

        Defendants.

Civil Action No. _____

**Class Action Complaint**

**Jury Trial Demanded**



Plaintiff, by and through his counsel, brings this action on behalf of himself and all other

persons similarly situated who owned shares of Bank of America Corporation ("Bank of

America," "BAC") on October 10, 2008, who were entitled to vote to approve the adoption of a

merger agreement between Bank of America and Merrill Lynch & Co., Inc. ("Merrill Lynch")

(the "Merger Agreement"), pursuant a Proxy Statement dated October 31, 2008 (the "Proxy

Statement") filed with the United States Securities and Exchange Commission ("SEC") on or

about November 3, 2008 (the "Class"). Plaintiff's allegations are based upon personal

knowledge with respect to himself, and upon information and belief with respect to all other

matters based on the investigation of plaintiff's counsel, including, but not limited to, counsel's

review of SEC filings, press releases and other public statements from Bank of America and

Merrill Lynch, and analyst reports, conference call transcripts, news articles and data reflecting

the trading prices of Bank of America and Merrill Lynch securities.

## NATURE OF THE ACTION

1.      Pursuant to the disclosures in the Proxy Statement, and under the terms of the merger approved by Bank of America shareholders on December 5, 2008 and consummated on January 1, 2009, each Merrill Lynch share was exchanged for 0.8595 of a share of Bank of America common stock (the "Merger").

2.      That Proxy Statement contained material misrepresentations and omitted to disclose true facts relevant to the Merger, including facts concerning the risk of and actual further deterioration of Merrill Lynch's assets and the fact that Merrill Lynch would accrue a massive $15.3 billion loss during the fourth quarter of 2008.  Despite the fact that the Merger vote did not occur until after over two-thirds of the fourth quarter had passed, Defendants failed to provide any correction, update or amendment to the Proxy Statement to disclose these facts to Bank of America shareholders prior to the vote on the Merger.

3.      On January 16, 2009, Bank of America announced losses of $15.31 billion resulting from credit and other asset losses at Merrill Lynch.  The announcement also revealed an agreement where the U.S. Treasury would invest $20 billion in Bank of America (in the form of preferred shares), and provide additional guarantees against losses on approximately $118 billion in assets, 75% of which were previously owned by Merrill Lynch.

## JURISDICTION AND VENUE

4.      The claims asserted below arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and the rules and regulations promulgated thereunder, including SEC Regulation 14a-9, 17 C.F.R. 240.14a-9.

5.      Jurisdiction is conferred upon this Court by Section 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. § 1331.

6.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law described in this Complaint occurred within this judicial district.  Among other things, Merrill Lynch (now part of defendant Bank of America) was at all times headquartered in this District and the release of financial information concerning Merrill Lynch emanated from this District.

7.     In connection with the acts alleged herein, defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, and the facilities of the national and regional securities market.

**PARTIES**

**Plaintiff**

8.     Plaintiff Steven J. Sklar (as IRA account beneficiary), as reflected in the attached certification, owned shares of Bank of America common stock at all times relevant hereto and was damaged thereby.

**Defendants**

9.     Defendant Bank of America is a Delaware corporation with its principal offices located in Charlotte, North Carolina.  At all relevant times, Bank of America operated as a bank holding company and financial holding company.

10.     Defendant Kenneth D. Lewis ("Lewis") is, and was at all relevant times, Chairman of the Board, Chief Executive Officer and President of Bank of America.

11.     Defendant John A. Thain ("Thain") was at all relevant times Chairman of the

Board and Chief Executive Officer of Merrill Lynch.

12.     Defendant Nelson Chai ("Chai") was at all relevant times Executive Vice President and Chief Financial Officer of Merrill Lynch.

13.     Defendant Gary Carlin ("Carlin") was at all relevant times Vice President, Controller and Chief Accounting Officer of Merrill Lynch.

14.     Defendants listed in paragraphs nine through twelve are sometimes hereinafter referred to collectively as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

15.     This action is brought by Plaintiff as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all other persons who owned shares of Bank of America common stock as of October 10, 2008, the record date for the vote on approval of the proposed Merger, and were damaged thereby.  Excluded from the Class are the defendants, affiliates of the defendants, and the immediate family members of the Individual Defendants.

16.     As of October 31, 2008, there were 5,017,579,321 outstanding shares of Bank of America common stock held by thousands of shareholders.  As a result, joinder of all potential class members in a single action is impracticable.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class, inasmuch as he is a member of the Class and his claim is typical of the claims of all Class members.  Plaintiff has retained competent counsel experienced in class action securities litigation.  Plaintiff has no interests that are adverse or antagonistic to those of the Class.  Plaintiff's interest is to obtain appropriate relief for himself and for the Class for the harms

Doc. 162807                                          4

arising out of the violations of law set forth herein.

18.     There are questions of law and fact common to all members of the Class in this

action, including, *inter alia*:

    a.     whether defendants violated the federal securities laws by making solicitations
using the Proxy Statement which contained statements that, at the time and in
light of the circumstances under which they were made, were false or misleading
with respect to a material fact, or which omitted to state a material fact necessary
in order to make the statements therein not false or misleading or necessary to
correct any statement made in earlier communications with respect to the
solicitation of the vote in the Proxy Statement; and

    b.     whether Defendants, by their wrongful conduct, caused and continue to cause
Plaintiff and other members of the Class to suffer damages and, if so, the proper
measure thereof.

19.     The questions of fact and law that are common to the Class predominate over any

questions solely affecting individual members.

20.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  It would be impracticable and undesirable for each member of

the Class who has suffered harm to bring separate actions.  In addition, the bringing of such

actions would put a substantial and unnecessary burden on the courts, while a single class action

can determine the rights of all class members with judicial economy.

21.     Furthermore, as the damages suffered and to be suffered by individual Class

members may be relatively small, the expense and burden of individual litigation makes it

impossible for the Class members individually to redress the wrongs done to them.  No unusual

difficulties are likely to be encountered in the management of the class action.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Merrill Lynch describes itself as "one of the world's leading capital markets,

advisory and wealth management companies with offices in 40 countries and territories and total

client assets of approximately $1.5 trillion at September 26, 2008.  As an investment bank, we

are a leading global trader and underwriter of securities and derivatives across a broad range of

asset classes, and we serve as a strategic advisor to corporations, governments, institutions and

individuals worldwide."

23.     Over the course of the last eighteen months, Merrill Lynch has reported net losses

over six consecutive quarters.  These losses were substantially attributable to declining values of

trading assets held by Merrill Lynch as a principal in those transactions.  The troubled assets

include certain categories of asset-backed securities, including mortgage-backed securities,

collateralized debt obligations (CDOs) and related derivative positions used as either hedges or

investments in their own right.

24.     Other investment banks had experienced similar difficulties amidst illiquid market

conditions and declining asset values.  Most notably, in March 2008, Bear Stearns became

effectively insolvent and was purchased by JPMorganChase in a deal arranged and backed by the

U.S. Treasury Department and the Federal Reserve.

25.     During the week of September 8, 2008, the stock prices of many major financial

services companies declined significantly as reports circulated regarding financial difficulties at

Lehman Brothers Holdings, Inc. ("Lehman").

26.     On September 10, 2008, Lehman pre-announced a $3.9 billion net loss for its third

6

quarter of 2008, as well as a number of initiatives to bolster its financial viability. Lehman's troubles were primarily associated with illiquid mortgage and real estate related securities. Despite Lehman's efforts to prevent insolvency, by September 12, 2008 it became clear that Lehman was running out of options and would likely file for bankruptcy.

27.    Given investors' perceptions of similar risks associated with Merrill Lynch's balance sheet, over the course of the week ending on September 12, 2008, Merrill Lynch's common stock price declined by $3.91 per share, or approximately 24 percent, to close at $12.59 per share on Friday, September 12, 2008.

28.    The Proxy Statement discloses that on the morning of Friday, September 12, 2008, the Merrill Lynch board of directors held an informational conference call during which senior management updated directors on recent market conditions, Lehman's waning financial viability, the status of Merrill Lynch's capital, liquidity and business results, Merrill Lynch's recent stock performance, and potential rating agency actions.

29.    During that conference call the Merrill Lynch board urged management to continue to evaluate the potential impact of market developments on Merrill Lynch and the possible courses of action Merrill Lynch might pursue in response to various possible scenarios. The Merrill Lynch board of directors stressed the need for Merrill Lynch to be prepared to act quickly as events unfolded.

30.    According to a September 19, 2009 article in The Wall Street Journal:

[On September 13, 2008,] John Thain, then Chairman and Chief Executive Officer of Merrill Lynch was busy at the New York Fed working on Lehman's problems when a sudden realization hit him: If he didn't act fast, his own brokerage firm, Merrill, might not survive this crisis. It occurred while listening to Lehman's president, Herbert H. "Bart" McDade III, give a sobering summary of Lehman's assets

and liabilities. "This could be me by Friday," Mr. Thain thought, according to people who have spoken to him.

The stakes were high for Mr. Thain, a Goldman alum and former head of the New York Stock Exchange who had been Merrill's CEO only since December.

Over the past year, Merrill has written down more than $46 billion due to bad bets on real estate and other mortgage-related investments. Mr. Thain was brought in to clean up the mess. Still, Merrill's stock was getting hammered. It had fallen more than 12% on Friday alone.

The 53-year-old Mr. Thain ducked out of his meeting, called Kenneth D. Lewis, the CEO of Bank of America Corp., and asked him if he'd be interested in buying Merrill.

31.     According to the same September 19, 2008, Wall Street Journal article:

Mr. Lewis didn't hesitate. Here was a chance for the Mississippi-born son of a soldier and night-shift nurse -- a man known among bankers for craving the respect of the Wall Street establishment -- to elevate Bank of America as rivals crumbled around him.

                    *              *              *

[B]y 2:30 that afternoon [on September 13, 2008], the two men were face to face in New York. The meeting set in motion a 36-hour marathon negotiating session.

32.     Based on news reports and the timing of the Merger, both Merrill Lynch and Bank of America moved quickly, in light of the apparently imminent bankruptcy of Lehman Brothers and deteriorating market conditions.  By Sunday, September 14, 2008, only one day after the process began, Merrill Lynch and Bank of America had agreed on the principal terms of the Merger, providing for a stock-for-stock acquisition of Merrill Lynch at an exchange ratio of 0.895 shares of Bank of America for each Merrill Lynch share.  As of September 14, 2008, the implied value of the consideration to Merrill Lynch shareholders was $29 per share and Merrill Lynch shareholders would own approximately 23% of the combined company.

33.     On September 15, 2008, Bank of America announced that it had agreed to acquire

Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that, according to Bank of America, "creates a company unrivaled in its breadth of financial services and global reach." According to the Bank of America press release:

> Bank of America Corporation today announced it has agreed to acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that creates a company unrivalled in its breadth of financial services and global reach.
>
> "Acquiring one of the premier wealth management, capital markets, and advisory companies is a great opportunity for our shareholders," Bank of America Chairman and Chief Executive Officer Ken Lewis said. "Together, our companies are more valuable because of the synergies in our businesses."

34.     During a conference call on September 15, 2008, Joe L. Price, Bank of America's CFO stated, "[t]he price represents roughly 1.8x stated tangible book value. It's roughly 12x Merrill Lynch's 2009 projects earnings based on First Call consensus estimates…we used First Call consensus estimates as a base for modeling the transaction."

35.     Analysts on the call questioned the rationale for the deal price and suggested that Bank of America may be overpaying for Merrill.  Matthew O'Connor, an analyst at UBS, pointed out "there's a lot of near-term uncertainty and I think a lot of people would view Merrill's stock as selling off today and this week if the deal hadn't been announced.  I guess the question is why pay $29 at this point?"

36.     Defendant Lewis quelled concerns by stating "the long term benefits were so overwhelming, it was such a strategic opportunity…we thought we had a compelling situation for the shareholders over the long-term."

37.     When another analyst asked about the necessary write-downs on Merrill's assets and if the numbers presented with the announcement include any mark-to-market write-downs,

Defendant Lewis answered "The numbers that we presented today we have considered marks on

the assets…I would tell you that, again, going back to the point of things such as CDOs, we have

very similar methodology valuations and we have very similar marks to structures.  We are

dealing with the same counterparties on things so again, we're pretty familiar with the types of

assets and feel pretty good about the progress that Merrill Lynch has made."

      38.    Analysts who studied the transaction also predicted the fact that Merrill Lynch

could experience further asset write-downs and losses that would impair the value of the Merger.

A Deutsche Bank analyst report, dated September 16, 2008, identified the potential risk of further

write-downs at Merrill Lynch:

> The big question surrounding capital market businesses is, "how much more in
> write-downs are likely ahead?" In particular, a new weakness at AIG has the
> potential to hurt Merrill's capital via any potential insurance on its ABS CDO.
> Alternatively, additional selling of risky commercial or residential real estate
> assets could impact Merrill's commercial real estate securities ($18B), other risky
> mortgage assets ($31B; includes $10B alt-A, subprime and non-US residential),
> and leveraged finance ($8B), not withstanding declines in these amounts since the
> end of 2Q08. In additions to the "risky" assets, Merrill also has $33.7B in US
> prime mortgages on balance sheet . . . Moreover, it seems as though BAC had
> only 36 hours of due diligence, which does not give extra comfort in an
> environment when loss estimates seem to increase quarter after quarter. Indeed,
> several details were not included in the presentation, such as pro forma
> management, location, timeline (besides deal close in early 1Q09 and conversions
> sometime in 2010), etc.  This by itself is less the issue (we have confidence that
> BAC can work this out in a reasonable manner given proven success in previous
> integrations) vs. the bigger issues of comfort with the level of marks on MER's
> books.  One way to think about the margin of safety for BAC is that its purchase
> price seems to give it room to incur $12 bil. of additional marks before the price is
> above MER's adjusted book value.

      39.    In light of all the foregoing, in preparing the Proxy Statement, and the materials

incorporated therein by reference, the Defendants were well aware of the severe, acute risks

associated with the types of now illiquid assets accumulated by investment banks generally, and

Merrill Lynch in particular, and had a due diligence obligation to ensure that disclosures to Bank

of America shareholders with respect to Merrill Lynch's financial condition were accurate and

complete.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS AND OMISSIONS CONCERNING THE MERGER**

**Merrill Lynch's October 16, 2008 Press Release
Announcing Third Quarter 2008 Financial Results**

40.     The Proxy Statement incorporated by reference several documents, including

Merrill Lynch's filing on Form 8-K dated October 16, 2008. That filing included as Exhibits

99.1 and 99.2, respectively, Merrill Lynch's press release announcing its results for the Third

Quarter of 2008 and a Preliminary Unaudited Earnings Summary for the Third Quarter. The

press release stated that Merrill Lynch reported:

> [A] net loss from continuing operations for the third quarter of 2008 of $5.1 billion,
> or $5.56 per diluted share, compared with a net loss from continuing operations of
> $2.4 billion, or $2.99 per diluted share, for the third quarter of 2007. Merrill Lynch's
> net loss for the third quarter of 2008 was $5.2 billion, or $5.58 per diluted share,
> compared with a net loss of $2.2 billion, or $2.82 per diluted share, for the year-ago
> quarter.

41.     In its financial results, Merrill Lynch breaks out its revenue among several

categories, including "principal transactions." In its November 4, 2008 Form 10-Q (discussed

below), Merrill Lynch described "principal transactions":

> Principal transactions revenues include both realized and unrealized gains and
> losses on trading assets and trading liabilities, investment securities classified as
> trading investments and fair value changes associated with structured debt. These
> instruments are recorded at fair value. Fair value is the price that would be
> received to sell an asset or paid to transfer a liability in an orderly transaction
> between marketplace participants. Gains and losses are recognized on a trade date
> basis.

42.    In its third quarter 2008 press release Merrill Lynch reported negative $6.5 billion in principal transactions revenue, indicating a net loss due to realized or unrealized losses (either asset impairment write-downs or declines in mark-to-market valuations) in the securities held on its balance sheet.

43.    Among the "significant items" driving third quarter revenues identified in the October 16, 2008 press release were write-downs and asset losses totaling $12.1 billion:

- Net write-downs of $5.7 billion resulting from the previously announced sale of U.S. super-senior ABS CDOs(1) and the termination and potential settlement of related hedges with monoline guarantor counterparties.
\*    \*    \*
- Net write-downs of $3.8 billion, principally from severe market dislocations in September, including real estate-related asset write-downs and losses related to certain government-sponsored entities and major U.S. broker-dealers, as well as the default of a U.S. broker-dealer.
\*    \*    \*
- Net losses of $2.6 billion, resulting primarily from completed and planned asset sales across residential and commercial mortgage exposures

44.    In conjunction with its Third Quarter release, Merrill Lynch noted "Third Quarter and First Nine Months of 2008 Highlights," including, among others:

- Significant progress in balance sheet and risk reduction; RWA declined by approximately 15 percent over the quarter; and

- Reductions of 98 percent of U.S. Alt-A residential mortgage net exposures. Including planned sales, reductions of 56 percent in non-U.S. residential mortgages and 25 percent in commercial real estate, excluding First Republic Bank and the U.S. Banks Investment Securities Portfolio.

45.    The October 16, 2008 Press Release, included a quote from Defendant John Thain where he stated that, "[w]e continue to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal. As the landscape for financial services firms continues to change and our transition teams make good progress, we believe even more that the

transaction will create an unparalleled global company with pre-eminent scale, earnings power and breadth."

**Merrill Lynch's Third Quarter 2008 Form 10-Q**

46.     On November 4, 2008, Merrill Lynch filed its quarterly report on Form 10-Q for the third quarter of 2008 (ended September 26, 2008) with the SEC.  The 10-Q was signed by Defendants Chai and Carlin.  The Proxy Statement, at pg. 124, specifically incorporated by reference "additional documents that either company files with the SEC" including "Quarterly Reports on Form 10-Q and Current Reports on Form 8-K."

47.     Merrill Lynch's November 4, 2008 Form 10-Q substantially incorporated the financial results and financial information quoted above from the October 16, 2006 8-K/Press Release and represented that the financial disclosures in the 10-Q complied with generally accepted accounting principles (GAAP).

48.     The Form 10-Q disclosed that Merrill Lynch had total assets of $875.8 billion, which included the following asset categories, totaling $ 261.5 billion, that were substantially subject to the losses and write-downs announced in the fourth-quarter of 2008 (discussed below):

| Asset Category | Value, in millions, as of September 26, 2008 |
|---|---|
| **Trading assets**, at fair value (includes securities pledged as collateral that can be sold or repledged of $27,074 in 2008), including: | 189,358 |
| Derivative contracts | 74,106 |
| Equities and convertible debentures | 34,311 |
| Corporate debt and preferred stock | 38,998 |
| Mortgages, mortgage-backed, and asset-backed | 19,130 |
| Non-U.S. governments and agencies | 8,998 |
| U.S. Government and agencies | 6,903 |
| Municipals, money markets and physical commodities | 6,912 |
| **Investment Securities**  (includes $4,045 in 2008 and $4,685 in 2007 measured at fair value in accordance with SFAS No. 159) (includes securities pledged as collateral that can be sold or repledged of $7,152 in 2008 and $16,124 in 2007) | 72,182 |
| **Total** | **$261,540** |

## The October 31, 2008 Joint Proxy Statement

49.     In addition to those statements detailed above, which were explicitly incorporated by reference into the Proxy Statement, on or about October 31, 2008 the parties jointly issued the Proxy Statement.  As detailed below, the Proxy Statement misrepresented and failed to inform Bank of America shareholders of material facts concerning Merrill Lynch's business, true financial condition and the substantial risks associated with Merrill Lynch's assets.  The cover letter enclosing the Proxy Statement was signed by Defendants Thain and Lewis.

50.     The Proxy Statement identified twelve distinct "Risk Factors," at pages 23 through 26, and stated that "stockholders should consider the matters described below in determining whether to adopt the merger agreement."  None of the Risk Factors identified provided disclosure concerning the specific risk that Merrill Lynch's assets were too complex and illiquid to value with any degree of specificity and that there was a substantial risk that the

true value of those assets were substantially less than the stated value, impairing the value of the

Merger to Bank of America shareholders.

51.     Under the heading "Recent Developments" the Proxy Statement disclosed that

Bank of America had agreed to sell $15 billion in preferred stock to the U.S. Treasury pursuant

to the Capital Purchase Program ("CPP") that was effectuated after Congress passed the

Emergency Economic Stabilization Act of 2008:

> On October 3, 2008, President Bush signed into law the Emergency Economic
> Stabilization Act of 2008 (the "EESA"). Pursuant to the EESA, the U.S. Treasury
> has the authority to, among other things, invest in financial institutions and
> purchase mortgages, mortgage-backed securities and certain other financial
> instruments from financial institutions, in an aggregate amount up to $700 billion,
> for the purpose of stabilizing and providing liquidity to the U.S. financial markets.
> On October 14, 2008, the U.S. Treasury announced a plan, referred to as the
> Capital Purchase Program, or the CPP, to invest up to $250 billion of this $700
> billion amount in certain eligible U.S. banks, thrifts and their holding companies
> in the form of non-voting, senior preferred stock initially paying quarterly
> dividends at a 5% annual rate. In the event the U.S. Treasury makes any such
> senior preferred investment in any company it will also receive 10-year warrants
> to acquire common shares of the company having an aggregate market price of
> 15% of the amount of the senior preferred investment. In connection with
> Treasury's 2008 announcement, Bank of America was identified as one of the nine
> financial institutions (including Merrill Lynch) that agreed in principle to
> participate in the first $125 billion of Treasury investments. As a result, on
> October 26, 2008, Bank of America entered into a purchase agreement with the
> U.S. Treasury pursuant to which it will issue to the U.S. Treasury $15 billion of a
> new series of preferred stock of Bank of America. In connection with this
> investment, Bank of America has also agreed to issue to the U.S. Treasury
> warrants to purchase approximately 73 million shares of Bank of America
> common stock at an exercise price of $30.79 per share. This investment is
> expected to be completed on or about October 28, 2008. If the merger is
> completed prior to Treasury making an investment in Merrill Lynch as described
> below under "- Merrill Lynch & Co Developments - Unaudited - Recent
> Developments," Treasury will purchase from Bank of America an additional $10
> billion of a new series of preferred stock of Bank of America and receive warrants
> to purchase approximately 49 million shares, all on the same terms applicable to
> the $15 billion investment.

52.    The Proxy Statement similarly disclosed that at the present time Merrill Lynch

would not participate in the CPP, pending the outcome of the Merger:

> After discussions with Treasury and Bank of America, Merrill Lynch has
> determined that, in view of the pending merger with Bank of America, it will not
> sell securities to the U.S. Treasury under the CPP at this time, but may do so in
> the future under certain circumstances. As a result, Merrill Lynch has entered into
> a purchase agreement that provides for delayed settlement for a sale of $10 billion
> of a new series of Merrill Lynch preferred stock and warrants to purchase
> 64,991,334 shares of Merrill Lynch Common Stock at an exercise price of $23.08
> per share. The agreement provides that the closing will take place on the earlier of
> (i) the second business day following termination of the Merger Agreement with
> Bank of America and (ii) a date during the period beginning on January 2, 2009
> and ending on January 31, 2009 if the Merger Agreement is still in effect but the
> merger has not been completed by the specified date, but, in the case of either (i)
> or (ii), in no event later than January 31, 2009. In addition, prior to January 2,
> 2009, if the Merger Agreement is still in effect but the merger is not been
> completed, Merrill Lynch has the right, after consultation with the Federal
> Reserve and Bank of America, to request that the U.S. Treasury consummate the
> CPP investment on or prior to January 1, 2009. The Purchase Agreement will
> terminate at 12:01 am on February 1, 2009 if the investment has not been made by
> that date.
>
> Completion of the CPP investment prior to the termination of the Merger Agreement
> is subject to Bank of America's approval. Bank of America has agreed it will not
> unreasonably withhold or delay its consent. After January 1, 2009, Bank of America
> may not withhold its consent if, after consulting with Bank of America, Merrill
> Lynch reasonably determines that the failure to obtain the CPP investment would
> have a material adverse impact on Merrill Lynch. After January 30, 2009 until 12:01
> a.m. on February 1, 2009, Merrill Lynch will have the unilateral right to obtain the
> CPP investment and Bank of America has consented in advance to the investment at
> such time if the merger has not been completed at that date.
>
> *          *          *
>
> On October 29, 2008, Merrill Lynch and Bank of America, N.A., a wholly owned
> subsidiary of Bank of America, entered into a $10 billion committed unsecured bank
> revolving credit facility with borrowings guaranteed under the Temporary Liquidity
> Guarantee Program. This facility will be available to Merrill Lynch until January 30,
> 2009 but may expire at an earlier date if the merger with Bank of America is
> terminated or consummated prior to January 30, 2009 or Merrill Lynch elects to
> participate in the CPP. If Merrill Lynch participates in the CPP, the proceeds received
> from the U.S. Treasury will be used to repay in full any outstanding amounts owed
> under this facility.

53.     The Proxy Statement contained statements from both companies highlighting the

potential benefits of the Merger.  Bank of America articulated numerous "Reasons for the

Merger" and included the "Recommendation of the Bank of America Board of Directors," which

stated the following at 54-55 (emphasis added):

> **Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors**
>
> The Bank of America board of directors consulted with Bank of America management as well as financial and legal advisors and determined that the merger is in the best interests of Bank of America and Bank of America stockholders. In reaching its conclusion to approve the merger agreement, the Bank of America board considered a number of factors, including the following material factors:
>
> • its understanding of Bank of America's business, operations, financial condition, earnings and prospects and of **Merrill Lynch's business, operations, financial condition, earnings and prospects**;
>
> *          *          *
>
> • the fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch made by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010;
>
> • the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK to Bank of America's board of directors concerning the operations, financial condition and prospects of Merrill Lynch and the expected financial impact of the merger on the combined company;
>
> • the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America;

54.     In describing the Representations and Warranties made by Merrill Lynch and Bank

of America, the Proxy Statement assured investors that these included determinations that no

"material adverse effect" has occurred between the date of the Merger Agreement and the date of the

closing of the Merger (emphasis added):

> The merger agreement contains customary representations and warranties of Merrill
> Lynch and Bank of America relating to their respective businesses.  With the
> exception of certain representations that must be true and correct in all material
> respects (or, in the case of specific representations and warranties regarding the
> capitalization of Merrill Lynch, true and correct except to a de minimis extent), no
> representation or warranty will be deemed untrue, inaccurate or incorrect as a
> consequence of the existence or absence of any fact, circumstance or event unless
> that fact, circumstance or event, individually or when taken together with all other
> facts, circumstances or events, has had or would reasonably be expected to have a
> material adverse effect on the company making the representation.
> *          *          *
> Each of Bank of America and Merrill Lynch has made representations and warranties
> to the other regarding, among other things:
> *          *          *
> o       capitalization;
> *          *          *
> o       **financial statements**, internal controls and accounting or auditing practices;
> *          *          *
> o       **the absence of material adverse changes;**
> *          *          *
> In addition, Merrill Lynch has made other representations and warranties about itself
> to Bank of America as to:
> *          *          *
> o       **investment securities** and commodities;

55.     The Merger Agreement, annexed to the Proxy Statement as Appendix A, included

the following language in paragraph 3.8, the definition of "Material Adverse Effect," the occurrence

of which would allow for the termination of the Merger :

> 3.8   Absence of Certain Changes or Events . (a) Since June 27, 2008, no event or
> events have occurred that have had or would reasonably be expected to have, either
> individually or in the aggregate, a Material Adverse Effect on Company.   As used
> in this Agreement, the term " Material Adverse Effect " means, with respect to Parent
> or Company, as the case may be, a material adverse effect on (i) **the financial**
> **condition, results of operations or business of such party and its Subsidiaries**
> **taken as a whole** ( provided , however , that, with respect to clause (i), a "Material
> Adverse Effect" shall not be deemed to include effects to the extent resulting from

(A) changes, after the date hereof, in GAAP or regulatory accounting requirements applicable generally to companies in the industries in which such party and its Subsidiaries operate, (B) changes, after the date hereof, in laws, rules, regulations or the interpretation of laws, rules or regulations by Governmental Authorities of general applicability to companies in the industries in which such party and its Subsidiaries operate, (C) actions or omissions taken with the prior written consent of the other party or expressly required by this Agreement, (D) changes in global, national or regional political conditions (including acts of terrorism or war) or general business, economic or market conditions, including changes generally in prevailing interest rates, currency exchange rates, credit markets and price levels or trading volumes in the United States or foreign securities markets, in each case generally affecting the industries in which such party or its Subsidiaries operate and including changes to any previously correctly applied asset marks resulting therefrom, (E) the execution of this Agreement or the public disclosure of this Agreement or the transactions contemplated hereby, including acts of competitors or losses of employees to the extent resulting therefrom, (F) failure, in and of itself, to meet earnings projections, but not including any underlying causes thereof or (G) changes in the trading price of a party's common stock, in and of itself, but not including any underlying causes, except, with respect to clauses (A), (B) and (D), to the extent that the effects of such change are disproportionately adverse to the financial condition, results of operations or business of such party and its Subsidiaries, taken as a whole, as compared to other companies in the industry in which such party and its Subsidiaries operate) or (ii) the ability of such party to timely consummate the transactions contemplated by this Agreement.

56.     During a special meeting on December 5, 2008, Bank of America Corporation shareholders approved the acquisition of Merrill Lynch by authorizing the shares of common stock to be issued in the merger.

57.     Despite the fact that Bank of America shareholders did not vote on the Merger until December 5, 2008, after over two-thirds of the fourth quarter had passed, the Proxy Statement was not updated, corrected, amended or supplemented with any information concerning the actual losses incurred by Merrill Lynch during the fourth quarter of 2008, or the risk that such losses could occur and would materially effect the value of Bank of America if the Merger were consummated, given the nature of the assets and the lack of or inability of Bank of

America to do adequate due diligence to value the assets. Nor was the Proxy Statement updated or corrected to reflect that owing to losses incurred by Merrill Lynch during the fourth quarter of 2008, Bank of America would be required to seek additional funding from the United States Treasury Department.

58.  The foregoing statements in paragraphs 40 through 57, contained in or incorporated by reference into the Proxy Statement:

    a.  misrepresented Merrill Lynch's financial results and financial position, including by overstating the assets recorded on Merrill Lynch's balance sheet as of the third quarter of 2008;

    b.  misrepresented the benefits of the Merger, including the value of the assets to be acquired from Merrill Lynch;

    c.  misrepresented, in Defendant's Thain's statements in the October 16, 2008 press release, that Merrill Lynch continued to "reduce exposures and de-leverage the balance sheet";

    d.  omitted to disclose that Merrill Lynch's financial results, and losses on principal transactions during the fourth quarter of 2008, were sufficient to trigger the termination of the Merger due to the occurrence of a material adverse effect;

    e.  omitted information about the magnitude and impact of losses incurred by Merrill Lynch during the fourth quarter of 2008; and

    f.  misrepresented and omitted to disclose information concerning the potential risks of acquiring Merrill Lynch and the potential for further material write-downs, impairments and losses on assets held by Merrill Lynch.

**THE TRUTH IS REVEALED**

59.     Events and disclosures that occurred after the December 5, 2008 voting on the

Merger have revealed the following, none of which was disclosed to Bank of America

shareholders:

      a.     Merrill Lynch would record a massive $15 billion loss in the fourth quarter of

            2008, its largest loss in any of past six quarters of consecutive losses, attributable

            mostly to losses incurred on assets held for trading and recorded as negative

            revenue under "principal transactions";

      b.     Defendants have admitted that this loss may have been sufficient to trigger the

            "material adverse effect" clause in the Merger Agreement, allowing Bank of

            America to terminate the Merger; and

      c.     That the Defendants knew of these facts and pursued additional funding under the

            CPP in order to complete the Merger.

60.     Despite his knowledge of Merrill Lynch's staggering losses, and without revealing

them to shareholders, Lewis forged ahead with the deal.  On January 1, 2009, Bank of America

completed its purchase of Merrill Lynch.   Defendant Lewis was still positive on the closing of

the merger, stating, "[w]e are now uniquely positioned to win market share and expand our

leadership position in new markets around the world."

61.     On Thursday, January 15, 2009, The Wall Street Journal reported that Bank of

America would receive additional funding under the CPP and that such funding was sought

earlier in December by Defendant Lewis.  The article also reported that the massive fourth

quarter losses at Merrill Lynch necessitated this additional funding:

The U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co., according to people familiar with the situation.

Discussions over these funds began in mid-December when Bank of America approached the Treasury Department. The bank, already the recipient of $25 billion in committed federal rescue funds, said that it was unlikely to complete its Jan. 1 purchase of the ailing Wall Street securities firm because of Merrill's larger-than-expected losses in the fourth quarter, according to a person familiar with the talks.

Treasury, concerned the deal's failure could affect the stability of U.S. financial markets, agreed to work with the Charlotte, N.C., lender on the "formulation of a plan" that includes new capital from the $700 billion Troubled Asset Relief Program, according to the person familiar with the talks. The amount and terms are still being finalized, this person said. Details are expected to be announced with Bank of America's fourth-quarter earnings, due out Tuesday.

Any possible arrangement might protect Bank of America from losses on Merrill's bad assets. There would be a cap on the amount of losses the bank would have to absorb, with the federal government being on the hook for the remainder, said one person familiar with the matter. Both the Federal Reserve and the Federal Deposit Insurance Corp., alongside the Treasury, are involved in the negotiations, say people familiar with them.

*       *       *

Bank of America is expected by some analysts to report a loss for the fourth quarter, or at least a smaller profit than expected. It is not known exactly how much Merrill lost in the same time period. Merrill's problems largely stem from the deterioration of assets on its books and trading losses, said a person familiar with the matter.

*       *       *

The deal between Bank of America and Merrill was forged during the hectic weekend last September that saw Lehman Brothers Holdings Inc. collapse and giant insurer American International Group Inc. start to unravel. Merrill Chief Executive John Thain, worried his firm would be next, pressed for a quick deal.

In the aftermath of Bank of America's acquisition of Merrill -- valued at $50 billion when it was announced and worth $19.36 billion when it closed -- its chief executive, Kenneth D. Lewis, was viewed as a savior of the financial-services industry, having rescued both Merrill and Countrywide without government assistance.

62.     The New York Times also reported on January 15, 2009, that Defendants Lewis

sent lawyers to New York in December to explore Bank of America's ability to terminate the

Merger since Merrill Lynch's losses during the fourth quarter of 2008 constituted a material

adverse effect.

63.     The January 15, 2009 The New York Times article confirmed that Defendant

Lewis had learned of the losses, analyzed them and then scheduled a meeting for December 17,

2008, a mere twelve days after the Merger vote, with government officials to discuss the impact

of the losses also.  The article also reported that **prior** to that December 17, 2008 meeting with

Treasury officials, Defendant Lewis had a telephone call with Federal Reserve Chariman

Bernanke to discuss Merrill Lynch's fourth quarter losses.  The New York Times reported that at

the December 17, 2008 meeting Defendant Lewis sought additional funds from the government

and told Treasury officials that Merrill Lynch's fourth quarter losses put the Merger in

"jeopardy" (emphasis added):

> The preparations for further support come after Bank of America's chief
> executive, Kenneth D. Lewis, told regulators in mid-December that the shotgun
> deal it signed just two months earlier with Merrill Lynch was in jeopardy.
>
> Billions of dollars in write-downs on mortgages, commercial real estate and other
> credit assets at the brokerage firm climbed into double-digit territory in the fourth
> quarter, pushing Merrill into a substantial loss, said a person who spoke
> anonymously because they were not authorized to disclose the information.
> Fearing their own capital base could not support Merrill's flagging assets,
> executives at Bank of America told regulators they would need assistance in
> order to close the deal by their target date of Jan. 1.
>
> *          *          *
>
> At one point in December, **Mr. Lewis even sent lawyers to New York to find
> out whether Merrill's situation amounted to a material-adverse situation that
> might allow the bank to cancel the deal,** according to a person familiar with the
> situation.
>
> As Mr. Lewis was learning at the time, Merrill was suffering losses in the fourth
> quarter on a host of credit-related products, say people familiar with the

company's results. While Merrill Lynch Chief Executive John Thain and Tom
Montag, the firm's global head of sales and trading, positioned these losses as
significant in various meetings with management, they described the losses as
"market related" and not out of step with the rest of Wall Street, according to
attendees at these meetings.

Mr. Thain often stressed the losses were from so-called legacy positions and not
new ones taken on by Mr. Montag, according to these people. Total Merrill losses
could total in excess of $10 billion, say people familiar with the matter.

*          *          *

**By Dec. 17, Mr. Lewis went to Washington to discuss what he had already
disclosed to Mr. Bernanke in an earlier phone call -- that his bank was
having trouble digesting Merrill's losses.  Mr. Lewis described the losses as
monstrous, according to a person familiar with the matter.**

At that 6 p.m. meeting, Mr. Bernanke and Mr. Paulson both told Mr. Lewis that
failing to complete the Merrill acquisition would be disastrous. The policy makers
said abandoning the deal would further destabilize markets, and would hurt the
bank, potentially setting off a ripple effect that would exacerbate a fragile
situation.

Messrs. Bernanke and Paulson also urged Mr. Lewis to finish the deal and not
invoke a material-adverse change clause, saying it was in his interest to finish the
deal. If they walked away, it would reflect poorly on the bank and suggest it hadn't
done its due diligence and wasn't following through on its commitments.

The policy makers told Mr. Lewis that if conditions were really as bad as he
believed, then the government could step in with a rescue similar to that used for
Citigroup Inc. in November. In such an arrangement, the government would
provide cash and guarantee against part of the firm's losses.

In addition to a capital injection from the Treasury, the Fed, Treasury and FDIC
are working on an asset-guarantee plan modeled after the Citi rescue. The
government may backstop a figure of $115 billion to $120 billion in Bank of
America assets, with BofA agreeing to take a portion of first losses, the Treasury
and FDIC taking second losses, and the Fed backstopping a large chunk of the
rest.

The Treasury rescue deal could be announced alongside the bank's earnings,
which have been moved up to a Friday release.

"Bank of America didn't do proper due diligence," said Bradley Dorman,
managing partner at WhaleRock Point Partners, a Providence, R.I., investment

adviser with 315,000 shares in the bank. He said Mr. Lewis "probably jumped the gun."

"There was a tremendous lack of transparency," added John Moore Sr., who controls 18,000 shares and lives in Charlotte, where is chairman of commercial real-estate firm Moore Cos. "As a shareholder, without disclosure and transparency it is extremely difficult to make a reasonable investment decision."

64.     Following the reports of the need to obtain additional CPP funding in light of

losses at Merrill Lynch, BAC shares declined by $1.88 each, or 18.4%, to close on January 15,

2009, at $8.32.

65.     News reports on January 16, 2009, continued to reflect the impact of the

deterioration of Merrill Lynch's financial condition.  On January 16, 2009, The Wall Street

Journal reported on the CPP funding to be received by BAC, including a $20 billion investment

in preferred stock and "insurance" on $118 billion in assets.  The article also noted that the

current market value of the combined Bank of America/Merrill Lynch was less than Bank of

America's stand alone market value prior to the announcement of the Merger, implying that the

market viewed Merrill Lynch as having negative value:

> Reeling from previously undisclosed losses from its Merrill Lynch & Co. acquisition, Bank of America Corp. is expected to receive an emergency capital injection of $20 billion from the Treasury, which will also backstop as much as $120 billion of assets at the bank, said people familiar with the plan.
>
> Reports of the unexpected Merrill losses sent Bank of America shares to their lowest levels since 1991, and set off a new round of debate in Congress about the scope and mission of the Treasury's financial-system bailouts.
>
> Thursday's 18% stock-market drop gives the Charlotte, N.C., bank a market value of $41.8 billion, a sum below the $46 billion in shares it originally offered for Merrill. Its shares have lost over 40% of their value in the past seven trading sessions.
>
> The developments angered some Bank of America shareholders, who began to

question why Chief Executive Kenneth Lewis didn't discover the problems prior to the Sept. 15 deal announcement. Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on Dec. 5, or before closing the deal on Jan. 1.

66.    In addition to the article above, the "Heard on the Street" column in the January 16, 2009, <u>Wall Street Journal</u> includes the following commentary on the Merger (emphasis added):

> Bank of America shareholders who voted for the Merrill Lynch purchase must be feeling a mix of emotions right now. Among them: anger.
>
> On Dec. 5, holders voted for the deal, which was initially announced during September's Lehman Brothers crisis.
>
> On the day of the vote, Chief Executive Kenneth Lewis said BofA would have "the premier financial-services franchise."
>
> When the deal closed Jan. 1, Mr. Lewis was still positive, saying: "We are now uniquely positioned to win market share and expand our leadership position in markets around the world."
>
> What shareholders weren't told: From mid-December, BofA executives were discussing with the Treasury possible extra aid to support the Merrill deal.
>
> **Since Merrill was going to be a big part of BofA, and since government aid often hurts the interests of common shareholders, investors can feel aggrieved that they weren't told what was going on behind the scenes.**
>
>          *             *             *
>
> BofA's acquisition of Merrill looked over-priced from the start. And Mr Lewis has said he wasn't pressured by the government into acquiring Merrill or Countrywide. While institutions were bailed out for mistakes made before the credit crunch hit, BofA looks set to be rescued from overambitious deals once it was in full-swing.

67.    A January 16, 2009 article in <u>The New York Times</u> provided additional detail about the deal with Treasury and further confirmed that Bank of America considered the fourth quarter losses at Merrill Lynch sufficient to invoke the "material adverse effect" clause in the Merger Agreement (emphasis added):

Two weeks after closing its purchase of Merrill Lynch at the urging of federal
regulators, the government cemented a deal at midnight Thursday to supply Bank
of America with a fresh $20 billion capital injection and absorb
as much as $98.2 billion in losses on toxic assets, according to people involved in
the transaction.

The bank had been pressing the government for help after it was surprised to learn
that Merrill would be taking a fourth-quarter write-down of $15 billion to $20
billion, according to two people who have been briefed on the situation, in
addition to Bank of America's rising consumer loan losses.

*      *      *

Even before the most recent deal with Merrill closed, troubles began to surface. At
the time, shareholders liked the strategic fit of adding Merrill Lynch, the nation's
biggest brokerage firm, to the nation's biggest bank. Still, they worried that Mr.
Lewis had paid a hefty premium -- or underestimated Merrill's losses -- in the
merger stitched together over the mid-September weekend that Lehman Brothers
filed for bankruptcy.

When the deal was announced, Mr. Lewis said that he had considered buying
Merrill months earlier but was not comfortable with its mortgage exposure. John
A. Thain, the chief executive of Merrill Lynch, said he had cleaned up much of his
company's problems. "We have been consistently cleaning up the balance sheet,
repairing the damage that was done over the last few years," Mr. Thain said.

Mr. Lewis praised Mr. Thain for decreasing risks at the firm and said that Merrill's
capital levels were in good shape.

As it turned out, more problems were lurking. In December, when executives at
Merrill began tallying losses on its mortgage investments, they were found to
exceed previous estimates. **The write-downs will total between $15 billion and
$20 billion, possibly its largest ever,** according to two people who have been
briefed on the situation, and include mortgage assets, commercial real estate and
other credit investments.

When it notified Bank of America of such gaping write-downs, the bank became
fearful it would not have the capital to cover them. The revelations, which came
just weeks before the merger was expected to close, prompted Bank of America to
ask the government for additional help.

**Shortly before Christmas, Bank of America told regulators that it might
walk away from Merrill because of mounting losses at the brokerage.** But the
regulators, concerned Merrill might founder, urged Mr. Lewis to press ahead.
Given the severity of the situation, government officials said they needed to take

immediate action to avert a systemic risk. The officials agreed to another capital infusion and said they would guarantee assets belonging to both companies.

68. Notwithstanding the evident stress to the financial condition of Bank of America (and Merrill Lynch) and the impact on the Merger, Defendants Lewis and Thain kept material developments, including Merrill Lynch's massive fourth-quarter losses and write-downs, from shareholders until January 16, 2009.

69. Before the opening of the financial markets on January 16, 2009, Bank of America reported its financial results for fiscal 2008 and the fourth quarter of 2008. Bank of America's press release also included information concerning Merrill Lynch's preliminary fourth quarter 2008 financial results.

70. The Bank of America's January 16, 2009, press release disclosed Merrill Lynch's fourth quarter 2008 results:

> Merrill Lynch preliminary results indicate a fourth-quarter net loss of $15.31 billion, or $9.62 per diluted share, driven by severe capital markets dislocations. (See the Transition Update section of this news release and supplemental earnings information provided on http://investor.bankofamerica.com for further details.)
>
> In view of the continuing severe conditions in the markets and economy, the U.S. government agreed to assist in the Merrill acquisition by making a further investment in Bank of America of $20 billion in preferred stock carrying an 8 percent dividend rate.
>
> In addition, the government has agreed to provide protection against further losses on $118 billion in selected capital markets exposure, primarily from the former Merrill Lynch portfolio. Under the agreement, Bank of America would cover the first $10 billion in losses and the government would cover 90 percent of any subsequent losses. Bank of America would pay a premium of 3.4 percent of those assets for this program.
>
>                          *              *              *
>
> Transition Update
>
> Merrill Lynch was acquired on January 1, 2009 creating a premier financial services

franchise with significantly enhanced wealth management, investment banking and international capabilities.

Merrill Lynch preliminary results indicate a fourth-quarter net loss of $15.31 billion, or $9.62 per diluted share, driven by severe capital markets dislocations.

Merrill Lynch's Global Wealth Management division generated $2.6 billion in net revenue in the period as fees held up well in the declining markets. The strongest performance came from the U.S. Advisory portion of the business. Retention of financial advisors remains consistent with historical trends.

Significant negative fourth-quarter items for Merrill Lynch include:

-- Credit valuation adjustments related to monoline financial guarantor exposures of $3.22 billion.

-- Goodwill impairments of $2.31 billion.

-- Leveraged loan writedowns of $1.92 billion.

-- $1.16 billion in the U.S. Bank Investment Securities Portfolio writedowns.

-- Commercial real estate writedowns of $1.13 billion.

71.     In Exhibit B to the Fourth Quarter 2008 Supplemental Information, made available by Bank of America on January 16, 2009, Bank of America disclosed that during the fourth quarter of 2008, Merrill Lynch had net negative revenue attributable to "principal transactions" of $13.1 billion and an additional $3.4 billion in net losses under "Other" which included "losses on investment securities, private equity investments, loans and other miscellaneous items."

72.     Following Bank of America's January 16, 2008 announcement, the price per share of Bank of America's common stock dropped further from its prior close of $8.32 per share, to close on January 16, 2009 at $7.18 per share, a decline of 14%. The cumulative decline on both January 15 and January 16, 2009, from the January 14, 2009 closing price of $10.20 per share,

totals $3.02, or 31%.

73.     The extent of the losses incurred at Merrill Lynch during the fourth quarter are

staggering.  Even in the context of Merrill Lynch's previous write-downs and losses over the past

six quarters, the loss attributable to "principal transactions" is greater than in any of the prior

quarters, as follows:

| | 2007 | | 2008 | | | |
|---|---|---|---|---|---|---|
| | 3rd Quarter | 4th Quarter | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
| Principal Transactions Revenue (Loss) (millions) | ($5,930) | ($12,596) | ($2,418) | ($4,083) | ($6,573) | ($13,109) |

74.     The news reports following Bank of America's disclosure of the $15 billion loss

at Merrill Lynch raised further question as to the accuracy and completeness of the disclosures

provided to Bank of America shareholders.  A January 17, 2009, article in The New York Times,

highlighted the question of when Merrill Lynch's losses became known to Defendants (emphasis

added):

> **"The question is, When did Merrill Lynch know they had these losses? A lot
> of times companies would disclose losses of that magnitude," said Michael
> Mayo, an analyst at Deutsche Bank. "This was dramatic."**
>
> Mr. Lewis told analysts that he was surprised to learn in December, three months
> after the bank snapped up Merrill Lynch in a shotgun deal, that the magnitude of
> losses at the brokerage was far greater than expected. **He said he had considered
> walking away from the deal at that point, but was persuaded not to, partly
> by regulators who feared that a failure to seal the deal could set off a new
> round of panic in the markets.**
>
> The decision to stick with Merrill despite its problems, he said, was patriotic. "I do
> think we were doing the right thing for the country," Mr. Lewis said.
>
> But that may not be the right thing for the bank's shareholders, who were already
> upset that Mr. Lewis appeared to have overpaid to achieve his dream of
> dominating the brokerage business.

                  *                  *                  *

> In the months after the merger, however, financial markets deteriorated more
> brutally. The bank's shareholders voted on the merger on Dec. 5. And while the
> full extent of Merrill's fourth-quarter losses might not have been fully known then,
> had shareholders had an idea of the extent of the losses, they may have agitated
> for the deal price to be renegotiated.
>
> Mr. Lewis said he had considered trying to renegotiate the price once he learned
> the extent of Merrill's losses. But he feared that the length of time required for a
> new shareholder vote would put Merrill and the markets at risk. More important,
> he said, the government did not want to risk new turbulence in financial markets if
> the deal were to be delayed.

                  *                  *                  *

> But Stuart Plesser, a banking analyst with Standard & Poor's Equity Research,
> said that by his estimates, Bank of America would not have needed the additional
> government capital without Merrill's problems. He said the bank could have cut
> its dividend in half to cover its capital needs. The situation, he said, "doesn't seem
> to be a good deal for shareholders at all."
>
> Also unanswered was why Bank of America explained only about $9 billion of
> Merrill's write-downs. There are also write-downs of at least $4 billion in Merrill's
> fixed-income unit. Those marks could be related to trades that were put on in
> recent months. A spokesman for Bank of America declined to comment.

75.      Similarly, a January 17, 2009 article in <u>The Wall Street Journal</u> raised questions

about the disclosures related to the Merger:

> Executives at both Bank of America and Merrill have indicated the losses at
> Merrill ballooned in mid December, leading to a meeting between Mr. Lewis and
> Treasury Secretary Henry Paulson on Dec. 17. However, the market for various
> credit-related products began to deteriorate in mid-November, leaving many
> Merrill Lynch insiders to ask what Merrill CEO John Thain knew, and when.
>
> Merrill lost $15.3 billion during the period, and the run-up in losses was
> concentrated in the firm's sales and trading department, run by Tom Montag, who
> was hired by Mr. Thain in 2008 to run that division. The two frequently told the
> firm's other top managers that the losses, while significant, were largely connected
> to so-called legacy positions at Merrill and the losses were "market-related" and
> not out of step with the rest of Wall Street, according to attendees at these
> meetings.
>
> Friday, some top executives and members of Merrill's board questioned privately

why they weren't told about the magnitude of the losses or that the deal was possibly in jeopardy. Mr. Thain declined to comment on whether he knew about the Dec. 17 meeting between Messrs. Paulson and Lewis.

Merrill incurred large losses during the fourth quarter from derivative trades with thinly capitalized bond-insurance companies whose financial health deteriorated considerably last year. Many of the derivative contracts were written to cover periods of more than 20 years, which meant the bond insurers wouldn't be on the hook for significant cash payouts for years.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATIONS OF
### SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 THEREUNDER

76.     Plaintiff repeats and realleges every allegation in the paragraphs above.

77.     The Defendants named herein solicited proxies from the members of the Class by means of the Proxy Statement, and all materials incorporated therein by reference, that contained material misrepresentations and omitted to disclose material facts necessary in order to make the statements therein, and incorporated therein, not false or misleading.

78.     As a result, the members of the Class were denied the opportunity to make an informed decision in voting on the Merger, are unable to escape financial injury resulting from their uninformed approval of the proposed Merger and the dilution and decline in value of Bank of America stock that resulted therefrom.

79.     Class members have suffered and will suffer significant financial damages as a result of the materially false and misleading Proxy Statement and the omissions from that Proxy Statement.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his behalf and on behalf of the Class, prays for judgment, as

follows:

      A.      Declaring Plaintiff to be a proper class representative and this action to be a proper class action;

      B.      Awarding Plaintiff and all other members of the Class damages against all Defendants, jointly and severally, together with prejudgment interest thereon;

      C.      Awarding Plaintiff legal fees and expert fees, together with interest, costs and disbursements; and

      D.      Awarding such other relief as to this Court appears just and proper.

## JURY DEMAND

Plaintiff and the Class demand a trial by jury on all issues.

Dated: January 21, 2009

Respectfully submitted,

WOLF POPPER LLP

By:_____

Lester L. Levy (LL 9956)
James A. Harrod (JH 4400)
Natalie M. Mackiel (NM 1948)
845 Third Avenue
New York, New York 10022
(212) 759-4600

*Counsel for Plaintiff*

## PLAINTIFF CERTIFICATION

I, Steven J. Sklar, hereby state:

1.      I have reviewed the annexed complaint against Bank of America Corp. and have authorized the filing of the complaint on my behalf by Wolf Popper LLP.

2.      I did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      As of October 10, 2008, I held in an IRA 1500 shares of Bank of America Corp. common stock entitled to vote on the merger between Bank of America Corp. and Merrill Lynch & Co., Inc., and continue to hold those shares.

5.      During the three-year period preceding the date of my signing this certification, I have not filed any complaint as a representative on behalf of a class under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20ᵗʰ day of January 2009

_____
Steven J. Sklar